# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN A. SYNEK, | ) | CASE NO. 5:11CV774 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| | ) | |
| BRIMFIELD TOWNSHIP, OHIO, et al, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court upon the motion of defendants Brimfield Township, Ohio; Sergeant Matthew McCarty; and Patrolman Jerry Dumont for summary judgment on all remaining claims. (Doc. No. 13.) Plaintiff Kathleen Synek opposes the motion (Doc. No. 15), defendants have filed a reply (Doc. No. 16), and plaintiff has filed a surreply (Doc. No. 21). For the reasons that follow, defendants' summary judgment is GRANTED IN PART and DENIED IN PART.

## I. FACTUAL AND PROCEDURAL BACKGROUND

While attending a party with friends, a confrontation occurred between plaintiff Kathleen Synek and two of the officers dispatched to the scene to respond to a complaint of rowdy behavior, defendants Sergeant Matthew McCarty and Patrolman Jerry Dumont of the Brimfield Township Police Department. The parties dispute many of the particulars, but Ms. Synek was arrested, handcuffed, and driven to the Brimfield Township Police Station in a patrol car. Ms. Synek alleges that her civil rights were violated under 42 U.S.C. § 1983 by the officers'

use of excessive force during her arrest and by Brimfield Township for failure to adequately train and supervise its police force with respect to the laws governing proper arrest procedures.

The specific circumstances involved are as follows: Late in the evening of August 8, 2009, five members of the Brimfield Township Police Department, including Sergeant McCarty and Patrolman Dumont, responded to a complaint regarding a party taking place at an apartment near the Brimfield Township Police Station. (Dumont Aff. [Doc. No. 13–2] ¶ 2; McCarty Aff. [Doc. No. 13–1] ¶ 2.) The police dispatcher advised the officers that there were many partygoers at the residence, that they were very intoxicated, and that some were jumping on a vehicle. (McCarty Aff. ¶ 2.) Arriving at the apartment, Officer McCarty encountered and arrested a young man for "prohibitions," known in more common parlance as underage possession and/or consumption of alcohol. (*Id.* at ¶¶ 3–4.) Next, the officers encountered a resident of the apartment, who told the officers she was hosting the party for some high school friends. (*Id.* at ¶¶ 5–6.) After speaking with the resident, the officers went to the rear of the apartment and claim to have entered the building when an individual exiting the apartment opened the door. (Dumont Aff. ¶ 3; McCarty Aff. ¶ 7.) Upon entering, the officers walked into the living room of the apartment and handcuffed another male partygoer. (Synek Aff. [Doc. No. 15–1] ¶ 5.) Next, the officers encountered plaintiff, a nineteen-year-old college student, five feet one inches tall and weighing 107 pounds, sitting on the couch in the crowded living room. (McCarty Aff. ¶ 8; Synek Aff. ¶¶ 2, 5–6.)

At this juncture, the facts become almost wholly contested. Officer McCarty contends that Synek's eyes were red and glassy and that he detected a "moderate odor of alcohol" on her breath. (McCarty Aff ¶ 9.) Synek flatly denies being in this condition. (Synek

Aff. ¶ 5.) The officers claim Synek immediately began yelling and using vulgar language toward them, telling them to leave. (Dumont Aff. ¶ 5; McCarty Aff ¶ 10.) Officer McCarty states that he asked Synek to calm down, but she would not, continuing to scream and direct profanities at McCarty and Dumont, which caused other partygoers to also begin yelling at the officers. (Dumont Aff ¶ 6; McCarty Aff ¶ 11.) Officer McCarty warned Synek that she would be arrested for disorderly conduct if she continued her behavior, to which, according to the officers, Synek responded with additional loud profanity. (Dumont Aff. ¶ 7; McCarty Aff. ¶ 12.) Next, Officer McCarty claims he informed plaintiff that she was under arrest and asked her several times to stand up, but Synek refused to do so. (Dumont Aff. ¶ 8; McCarty Aff. ¶ 13.) The officers state that McCarty then asked Synek if there was anything he could say or do to get her to stand up, and Synek replied, using still more profanity, that the officers could leave. (Dumont Aff. ¶ 9; McCarty Aff. ¶ 14.) Synek, however, remembers this exchange differently. She claims that the officers demanded she produce identification and that she responded by asking them "what this[*sic*] all about." (Synek Aff. ¶ 6.)

After words—whatever they may have been—were exchanged, the officers took Synek by the arm and lifted her up off of the couch and onto her feet. (Dumont Aff. ¶ 10; McCarty Aff. ¶ 15; Synek Aff. ¶ 6.) Synek states that, at this point, the officers "slammed [her] face first into the wall." (Synek Aff. ¶ 6.) In contrast, the officers claim that Synek immediately began to resist the officers by attempting to pull her arms away and break free of their grasp. (Dumont Aff. ¶ 10; McCarty Aff. ¶ 15.) Next, Officer McCarty placed Synek's right wrist into a "wrist lock" and handcuffed her. (Dumont Aff. ¶ 11; McCarty Aff. ¶ 16; Synek Aff. ¶ 6.) The officers claim this was because Ms. Synek continued to scream and resist their attempts to apply

the cuffs. (Dumont Aff. ¶ 11; McCarty Aff. ¶ 16.) Synek states, instead, that she simply asked why she was being arrested, and the officers responded (apparently in unison) that it was because she was a "stupid girl." (Synek Aff. ¶ 6.) These events, Synek claims, caused her pain, fear, and humiliation. (*Id.*)

Once Synek was handcuffed, Officer McCarty began to escort her out of the apartment (Dumont Aff. ¶ 12; McCarty Aff. ¶ 17; Synek Aff. ¶ 7), while Officer Dumont remained inside the apartment in an attempt to identify partygoers, defuse the situation, and further investigate the complaint (Dumont Aff. ¶ 12; McCarty Aff. ¶ 17). Not surprisingly, the officers claim that Synek continued to struggle, scream profanities, and incite other partygoers (Dumont Aff ¶ 12; McCarty Aff. ¶ 17), while Synek denies having done so (Synek Aff. ¶ 7). For her part, Synek claims Officer McCarty dragged her out the door, down the front steps, and across the yard toward a police cruiser. (*Id.*) According to Synek, she was not struggling with McCarty, but rather struggling to stay upright and walk along with the officer as he "jerked [her] off balance" and "threw [her] around." (*Id.*) Nor, she claims, was she the one shouting; rather, she contends, other people observing the situation were shouting at McCarty to "take it easy" on Synek because "she is just a small girl." (*Id.*) Synek purportedly felt more pain, fear, and humiliation from these proceedings. (*Id.*)

Arriving at the police cruiser, Officer McCarty opened the rear door and told Synek to get in. (McCarty Aff. ¶ 18; Synek Aff. ¶ 8.) McCarty states that Synek refused his repeated requests that she enter the vehicle, and was cursing, screaming, and "stiffen[ing] up her body." (McCarty Aff. ¶¶ 18–19.) In order to get Synek into the cruiser, Officer McCarty claims that he "pushed on her right hip to make her lose her balance" and fall in. (McCarty Aff. ¶ 19.)

4

According to McCarty, Synek, now partially within the back seat of the car, began trying to kick at him and at the door of the vehicle. (*Id.*) McCarty claims that he had to put his left leg onto Synek's legs to keep her from kicking and that she refused to heed his orders to cease her behavior. (*Id.*) However, McCarty states that he was eventually able to remove his leg and close the cruiser door. (*Id.*) Conversely, Synek states that she was merely attempting to maneuver into the vehicle, as asked, when McCarty "literally kicked [her] into the rear seat with his foot . . . ." (Synek Aff. ¶ 8.) This, Synek claims, caused still more pain, fear, and humiliation. (*Id.*)

At the police station, Synek refused a test that would have determined her blood alcohol content. (McCarty Aff. ¶ 22.) She was charged with a violation of Ohio's prohibition against possession or consumption of beer or intoxicating liquor under Ohio Revised Code § 4301.69(E)(1), disorderly conduct under § 2917.11(A)(2), and resisting arrest under § 2921.33(A). (*Id.*)

In her criminal case, brought in Portage County Municipal Court, Synek filed a motion to suppress, challenging, among other things, the officers' entry into the apartment and the lawfulness of her arrest. (Journal Entry, *State of Ohio v. Kathleen A. Synek*, Portage County Municipal Court Case No. K2009CRB1810 (June 15, 2010) [Doc. No. 13–3] at 84–85.)[1] The court held an evidentiary hearing at which six witnesses testified: Officers McCarty and Dumont, a third officer who was on the scene, and three residents of the apartment, including the resident who spoke with Officers McCarty and Dumont at the party. (*Id.* at 84.) Synek was present at the hearing and represented by counsel. (*Id.*)

---

[1] All references to specific page numbers in the record refer to the continuous page numbering applied by the electronic docketing system.

The state court judge ruled that the officers were given consent to enter the apartment[2] and acted lawfully in arresting Synek, denying her motion to suppress as to those issues. (*Id.* at 85.)[3] As part of that determination, the state judge found that, "upon the officers entering the residence and going upstairs, the officers encountered the defendant who was using profane language directed at the officers on several occasions, instructing the Brimfield officers to leave the residence and get out of the residence." (*Id.*) Further, "[a]fter the officers warned [Synek] to cease and desist her disorderly behavior, [Synek] continued to use profane language at the officers," and "[t]hese profanities directed at the officers caused the other people in the apartment to become agitated and uncooperative." (*Id.*)

Following the state court's ruling on the suppression issue, Synek pleaded no contest and stipulated to a finding of guilty to an amended charge of disorderly conduct, a misdemeanor of the fourth degree. Synek was given a 30-day suspended sentence, provided that she have no violations of law for one year, and fined $250.00. (Judgment Entry and Sentencing, *State of Ohio v. Kathleen A. Synek*, Portage County Municipal Court Case No. K2009CRB1810 (Aug. 24, 2010) [Doc. No. 13–4] at 86.)

On March 18, 2011, Synek brought the present action in the Portage County Court of Common Pleas, seeking relief under 42 U.S.C. § 1983 for alleged violations of her constitutional rights. (Compl. [Doc. No. 3].) Plaintiff contends that McCarty and Dumont used excessive force during her arrest and that Brimfield Township failed to properly train and

---

[2] Synek had challenged the officers' right to enter the apartment in state court, and she still states in her affidavit that the officers "burst into the house without permission." (Synek Aff. ¶ 4.) Although Synek no longer disputes the lawfulness of the officers' entry, the Court notes that Synek offers no explanation of how she could possibly have personal knowledge to support this assertion.

[3] The state judge did suppress all statements made by Synek after her arrest, because Officer McCarty testified that he could not remember whether he had read Synek her *Miranda* rights. (Journal Entry at 85.)

supervise the officers. (*Id.* at ¶¶ 11, 13.)[4] Defendants removed to this Court (Doc. No. 1) and asserted the defense of qualified immunity. This Court granted defendants leave to file the subject motion on their qualified immunity defense.

## II. DISCUSSION

### A.        Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The party opposing the motion may not rely merely on allegations or denials in its own pleading; rather, by affidavits or materials in the record, they must set out specific facts showing a genuine issue for trial. FED. R. CIV. P. 56(c)(1). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[4] Synek brought additional claims in her complaint, alleging that her arrest was illegal and that defendants violated her Sixth Amendment right to a fair trial in her underlying criminal case. (Compl. ¶¶ 11–14.) After defendants submitted their motion for summary judgment, plaintiff moved unopposed to dismiss all of her claims except excessive force and failure to train and supervise (Def.'s Mot. for Voluntary Partial Dismissal [Doc. No. 14]), and the Court granted plaintiff's motion (Non-Document Order, Sept. 21, 2002).

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mere conclusory allegations "are not evidence and are not adequate to support a motion for summary judgment." *Miller v. Aladdin Temp-Rite, LLC*, 72 Fed. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

In ruling on a motion for summary judgment, the court may not take into account credibility, the weight of the evidence, or the drawing of inferences from the facts. *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Evaluated thusly, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* at 248.

8

Accordingly, for the purposes of deciding this motion, and where communicated properly under Rule 56, plaintiff's account of the facts must be accepted as true.

**B.**        **Defendants' Arguments against the Sufficiency of Plaintiff's Evidence**

In support of their motion, defendants contend that Synek's affidavit contains improper assertions which do not meet the personal knowledge requirement of Fed. Rule 56(c). (Def.'s Reply Br. [Doc. No. 16] at 140.) The Court agrees. Accordingly, the Court will disregard the portions of Synek's affidavit which are conclusory, subjective personal opinion, hearsay, and otherwise contradicted by the established record from the state court proceedings. *See Arendale v. City of Memphis*, 519 F.3d 587, 605–07 (6th Cir. 2008).[5]

Defendants' reply brief also argues that summary judgment on plaintiff's excessive force claim is warranted because plaintiff's affidavit is "blatantly contradicted by the record" such that "no reasonably[*sic*] jury could believe it." (Def.'s Reply Br. at 140–44.) The Court disagrees.

In arguing their point, defendants invoke the rule from *Scott v. Harris*, which states: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." 550 U.S. 372, 380 (2007). In *Scott*, the Supreme Court entered summary judgment in favor of a police officer accused by a

---

[5] Indeed, in the Court's fact recitation, the Court has deliberately omitted such offending provisions of Synek's affidavit. By way of example, Synek lacks personal knowledge to claim that everyone in the room with her was "shocked" by the actions of the officers. (Synek Aff. ¶ 5.) She also may not assert that the police "burst into the house without permission," as she lacks personal knowledge and the state judge's findings contradict her. (*Id.* ¶ 4). Similarly, Synek may not contend that she did not swear at the officers and was not disorderly (*Id.* ¶ 9), because the state judge found otherwise, and because she was found guilty of disorderly conduct (Judgment Entry and Sentencing at 86).

motorist of using excessive force in ramming the motorist's car after a high-speed chase. *Id.* at 386. Although the parties gave differing accounts of what happened, the record contained a videotape, not alleged to have been doctored or altered in any way, that validated the officer's side of the story. *Id.* at 379.

The Sixth Circuit has recognized that the *Scott* rule applies only in rare cases. In *Coble v. City of White House*, 634 F.3d 865, 871 (6th Cir. 2011), the court denied summary judgment in an excessive force claim. The plaintiff there testified that, in the course of his arrest, an officer dragged him across the ground on a broken ankle while plaintiff screamed in pain and called the officer names, eventually dropping plaintiff face-first onto the concrete. *Id.* at 866. Although the events occurred away from the patrol car's video camera, the officer's microphone recorded and transmitted audio from the incident. *Id.* The district court awarded summary judgment on the basis that the audiotape revealed "only the sound of shuffling bodies," not sounds of screaming, name-calling, or a body falling to the pavement. *Id.* at 867. Citing the different factors that can affect the recording of sound, and noting that some facts were not contradicted by the recording at all, the Sixth Circuit reversed the grant of summary judgment. *Id.* at 871. *See also Carter v. City of Wyoming*, 294 Fed. App'x 990, 992 (6th Cir. 2008) (court of appeals affirmed denial of summary judgment under *Scott* in an excessive force case where video and MRI evidence failed to blatantly contradict plaintiff's description of events).

As in *Coble*, defendants here mistake evidence that merely conflicts with Synek's account with evidence that "blatantly contradicts" it. Defendants' motion relies solely upon affidavits from the defendant officers, the police report filed by defendant McCarty, and the state judge's journal entry; plaintiff's motion relies solely upon plaintiff's affidavit.

10

As it pertains to Synek's excessive force claim, defendants cannot point to any evidence that even comes close to the indisputable "record" evidence that "blatantly contradicted" the arrestee's affidavit in *Scott*. As discussed in the next section, however, evidence presented in the record does dispose of Synek's failure to train and supervise claim.[6]

### C.        Failure to Train and Supervise

Synek claims that Brimfield Township failed to adequately train its police officers that § 2935.26(A) of the Ohio Revised Code forbids the arrest of a suspect for a minor misdemeanor, except in certain specific circumstances. In support, Synek attaches two documents from the Brimfield Police Department: Policy Number 7.1, entitled "Arrest, Chapter 7," and Policy Number 10.2, entitled "Use of Force Continuum/Department Weapons: Chapter 10, Use of Force." (Pl.'s Resp. Ex. B [Doc. No. 15–2] at 119–133.)

Defendant Brimfield Township argues that it is entitled to summary judgment on Synek's claim that it failed to properly train and supervise its officers with respect to an Ohio statute forbidding the arrest of a minor misdemeanant in the absence of specific additional circumstances.[7] The Court finds that Synek's failure to train and supervise claim fails as a matter of law on multiple grounds. First, collateral estoppel precludes Synek from asserting that her arrest was for a minor misdemeanor and thus allegedly the result of improper training by the township. Second, the violation Synek alleges—an illegal arrest under Ohio law—is not a constitutional violation protected by § 1983. Third, because the trial court in Synek's criminal

---

[6] Had Synek not dismissed them, based upon the state court's findings in ruling on the suppression issue, the same would be true for her claims challenging the officers' entry into the premises and the lawfulness of her arrest.

[7] Plaintiff calls her *Monell* claim "failure to train *and supervise*." At times, her briefing refers to the claim in the plural, as if it were two separate claims; at other times, the claim is discussed in the singular. Regardless, plaintiff never addresses any alleged "failure to supervise," and none of the facts or arguments plaintiff does put forth suggests that she cognizes it separately from her failure to train claim.

case found that the officers acted in accordance with Ohio law, any failure by the township to train the officers on that aspect of state law is not implicated here. Fourth, Synek's alleged injury—her excessive force claim—is not sufficiently causally related to the alleged training deficiency.

A municipality may be liable under § 1983 when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). The threshold for establishing municipal liability is greater than simple respondeat superior; there must be more than merely an employer/employee relationship with the tortfeasor. *Id.* at 692. To assess liability to Brimfield Township for failure to adequately train its police officers, plaintiff must prove "that the training program is inadequate to the task an officer must perform; that the inadequacy is the result of deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)).

*1. Synek's Failure to Train and Supervise Claim is Precluded by Collateral Estoppel*

Issues decided in a criminal proceeding in state court may preclude relitigation of the same issues in a subsequent § 1983 action in federal court. *Donovan v. Thames*, 105 F.3d 291, 293 (6th Cir. 1997) (citing *Allen v. McCurry*, 449 U.S. 90, 102 (1980)). In federal actions, including § 1983 actions, however, a state court judgment will not be given preclusive effect if "the party against whom an early court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." *Haring v. Prosise*, 462 U.S. 306, 313 (1983) (quoting *Allen*, 449 U.S. at 101 (1980)).

In *Allen v. McCurry*, McCurry, a criminal defendant, argued in a motion to suppress that officers had seized evidence against him in violation of the Fourth and Fourteenth Amendments. 449 U.S. at 91. The trial court denied the motion in part, and McCurry was convicted by a jury. *Id.* McCurry then brought suit under § 1983 against the officers who had made the seizure. *Id.* The Court ruled that collateral estoppel barred McCurry's claim, stating that "[t]here is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all." *Id.* at 104.

There are two types of collateral estoppel, also known as issue preclusion: offensive and defensive collateral estoppel. Offensive collateral estoppel occurs when a plaintiff seeks to bar a defendant from litigating an issue that defendant has already litigated and lost in an earlier action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979). Defensive collateral estoppel occurs when a defendant seeks to bar a plaintiff from litigating an issue that plaintiff has already litigated and lost in an earlier action. *Id.* Here, defendants assert defensive collateral estoppel. Because a federal court must give a state court judgment the same preclusive effect as it would have been given under the law of the state in which the judgment was rendered, *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984), the Court examines the Ohio law of collateral estoppel.

Under Ohio law, collateral estoppel applies when the fact or issue "(1) was actually and directly litigated in the prior action, (2) was passed upon or determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a

party in privity with a party to the prior action." *Thompson v. Wing*, 637 N.E. 917, 923 (Ohio 1994). Synek does not argue that the Portage County Municipal Court is not a court of competent jurisdiction, and Synek is the relevant party in both actions. She does dispute, however, that any issues related to her remaining claims were "actually and directly litigated" in the state proceeding. (Pl.'s Resp. at 105–08.)

   For purposes of the Court's collateral estoppel analysis, the only relevant claim brought by Synek in the state court is that her arrest by defendants McCarty and Dumont was unlawful. Although Synek did not raise her excessive force or failure to train and supervise claims at her state court hearing, in ruling that Synek's arrest was lawful, the state judge necessarily made findings of fact with respect to her arrest that bear on her failure to train and supervise claim.

   The Court finds that Synek actively litigated the legality of her arrest in the state court hearing and that the findings of fact and conclusions of law arising from that litigation are entitled to preclusive effect.

   At the hearing, Synek was represented by counsel, and the judge heard testimony from six different witnesses, including Officers McCarty and Dumont. (Journal Entry at 84.) The judge found that Synek "us[ed] profane language directed at the officers on several occasions, instructing the Brimfield officers to leave the residence," and that "these profanities directed at the officers caused the other people in the apartment to become agitated and uncooperative." (*Id.* at 85.) The judge ruled that even though Synek was cited for minor misdemeanor disorderly conduct, which is generally not an offense for which officers can make an arrest, OHIO REV. CODE 2935.26(A), the officers had warned plaintiff "to cease and desist her behavior" before her

14

arrest, and therefore the arrest was lawful. (Journal Entry at 85); *see* OHIO REV. CODE 2917.11(E)(3)(a) ("Disorderly conduct is a misdemeanor of the fourth degree if . . . [t]he offender persists in disorderly conduct after reasonable warning or request to desist); *State v. Sutterfield*, No. 02CA735, 2002 WL 31712663, at *2 (Ohio Ct. App. Nov. 26, 2002) (holding that an arrest for persistent disorderly conduct was valid despite "the generic nature of the charge in the citation and its appearance on a form designated for minor misdemeanors").

Although plaintiff contests the alleged behavior that elevated the category of her offense, this issue was actually litigated and decided by the state judge, who found that the behavior occurred. Indeed, at the end of the day, Synek pleaded "no contest" to and was convicted of a fourth degree disorderly conduct misdemeanor. Accordingly, collateral estoppel precludes Synek from arguing that she was improperly arrested for a minor misdemeanor, the very basis of her *Monell* claim.

2. *The Violation Allegedly Caused by the Township Policy Is Not a Constitutional Violation*

Synek's failure to train and supervise claim also fails because the violation she alleges does not involve a constitutional right protected by § 1983. "The violation of a right created and recognized only under state law is not actionable under § 1983." *Harrill v. Blount Cnty., Tenn.*, 55 F.3d 1123, 1125 (6th Cir. 1995). Synek's allegations are premised upon § 1983 and violations of the Fourth Amendment. However, "the Fourth Amendment does not forbid warrantless arrests for minor misdemeanors." *Hall v. Vill. of Gratis*, No. 3-07-cv-351, 2008 WL 4758693, at *8 (S.D. Ohio Oct. 27, 2008) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). "Specifically, Ohio's requirement that an individual may not be taken into custody for committing a minor misdemeanor is greater than the requirements of the Fourth

15

Amendment." *Hall*, 2008 WL 4758693, at *8 (citing *State v. Brown*, 792 N.E.2d 175, 177 (Ohio 2003)).

Synek alleges that her constitutional rights were violated by Brimfield Township's failure to adequately train its police officers that an Ohio statute forbids arrest of minor misdemeanor suspects except in the presence of specific additional circumstances. Because she has no constitutional right to avoid arrest for commission of a minor misdemeanor, her *Monell* claim must fail as a matter of law.

### 3. The Trial Court Found the Officers Acted in Accordance with State Law

Even if Synek could show that Brimfield Township's policy showed that its police officers had been inadequately trained about when to arrest and when not to arrest minor misdemeanants pursuant to Ohio law, the alleged inadequacy is not implicated here because the officers acted correctly under Ohio law. The state judge found that Synek was arrested not for a minor misdemeanor, but a fourth degree misdemeanor, an offense for which arrest was proper. Thus, as determined by the state judge, the Ohio statute Synek accuses Brimfield Township of ignoring in its arrest policy is not even at issue here.[8] As a result, then, a policy that allegedly inadequately trains officers for handling minor misdemeanor arrests has nothing to do with Synek's alleged injury, which is fatal to her *Monell* claim.

---

[8] Moreover, if the state judge had found Synek to have been arrested for minor misdemeanor disorderly conduct, the evidence suggests the arrest would have still been lawful under state law. Section 2935.26(A)(2) of the Ohio Revised Code allows officers to arrest a person for the commission of a minor misdemeanor if "[t]he offender cannot or will not offer satisfactory evidence of his identity." Synek admits that the officers demanded she produce identification and that she responded by asking a question instead of complying with the officers' order. (Synek Aff. ¶ 6.)

*4. The Policy in Question is Unrelated to Synek's Excessive Force Claim*

Yet another reason Synek's failure to train and supervise claim fails is because the alleged inadequacy in Brimfield Township's policy is not closely related to Synek's alleged injury (i.e., the alleged use of excessive force). A plaintiff asserting a failure to train claim under § 1983 must show more than "but for" causation between the lack of training and the constitutional injury at issue. *Harris*, 489 U.S. at 393 (O'Connor, J., concurring in part and dissenting in part) (noting agreement with the plurality on this proposition).

The Sixth Circuit examined this issue in *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004). There, Graham, in the course of being arrested for a marijuana offense, secretly ingested large amounts of cocaine and died in a jail cell soon thereafter. *Id.* at 379–80. He was treated by a nurse, who was hired as part of a county contract hiring independent medical professionals to provide care to prisoners in jails. *Id.* at 380. The representative of Graham's estate sued the county, claiming that Graham's constitutional right to adequate medical care was violated and that the county caused that violation by creating a policy of "automatic deference" by jail personnel to the independent medical professionals' decisions and by allowing nurses to perform duties beyond that which they could perform under state law. *Id.* at 380–81. The court held that the requisite causal link between the county policy had not been established. *Id.* at 383. "[E]ven assuming that Graham did suffer a constitutional violation, that violation 'resulted from factors other than a faulty [County policy].' " *Id.* at 384–85 (quoting *Harris*, 489 U.S. at 390–91) (second alteration in the original). "The fact that individual actors may 'occasionally make mistakes . . . says little about the . . . legal basis for

17

holding the [County] liable.' " *Estate of Graham*, 358 F.3d at 385 (quoting *Harris*, 489 U.S. at 391) (ellipses and alteration in the original).

Similarly, Synek argues, without any supporting evidence, that Brimfield Township's training program will cause its officers to violate state law prohibiting the arrest of minor misdemeanants more often, which will lead to more arrests, which will "cause" constitutional violations when the officers, in making those arrests, use excessive force against the arrestees. But just as a policy placing independent medical professionals in jails does not "cause" the medical professionals to distribute inadequate medical care to prisoners, *Estate of Graham*, 358 F.3d at 383, a policy placing police officers in the position of making an arrest does not "cause" the officers to use excessive force against arrestees.

Accordingly, for all of the foregoing reasons, defendants' motion for summary judgment on Synek's failure to train and supervise claim against Brimfield Township is GRANTED.

**D.**         **Excessive Force and Qualified Immunity**

Officers Dumont and McCarty argue that they are entitled to qualified immunity with respect to Synek's excessive force claims. However, because material issues of fact persist, the Court cannot so rule at this time.

"In order to prevail in a § 1983 action for civil damages from a government official performing discretionary functions, the defense of qualified immunity that our cases have recognized requires that the official be shown to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Through the

18

use of qualified immunity, the law shields 'governmental officials performing discretionary functions . . . from civil damages liability so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (ellipsis in original)). Qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation omitted).

Qualified immunity analysis proceeds in two stages. First, the Court must consider the "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If that question is answered in the affirmative, the Court next asks "whether the right was clearly established . . . in light of the specific context of the case . . . ." *Id.* "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotation omitted). Although the Supreme Court recently held that this two-stage approach is no longer mandatory, it "continue[s] to recognize that the *Saucier* protocol is often beneficial." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When a defendant raises a qualified immunity defense, the burden is on the plaintiff to prove that the officers are not shielded by qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

The standard for qualified immunity in an excessive force context is one of "objective reasonableness" under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388

(1989). However, as the Sixth Circuit noted in *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002), this standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* at 944 (citing *Graham*, 490 U.S. at 396).

The use of more force than necessary is not permitted whether or not an arrest is lawful, *Graham*, 490 U.S. at 394 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)), but the reasonableness of the force used to make an arrest "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. There is no hard and fast test for determining reasonableness. The determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (quoting *Graham*, 490 U.S. at 396).

The issue here is whether the officers used excessive force in arresting Synek. There is little agreement between the officers and Synek on the factual circumstances of her arrest. Be that as it may, both sides assert that the officers initiated physical contact with Synek by lifting her off the ground and that Officer McCarty placed Synek in a "wrist lock" soon after.

Synek claims the officers slammed her face-first into a wall after lifting her off the couch. She also contends that Officer McCarty dragged her through the apartment, down steps, and across the yard toward a police cruiser, where he kicked her into the back seat as she was attempting to maneuver into the vehicle.

In contrast, the officers claim that Synek spewed profanity at them throughout their encounter and continuously resisted their attempts to arrest her. They state that Synek attempted to pull her arms away and break free of their initial grasp, screaming and resisting their attempts to handcuff her, necessitating Officer McCarty's use of the "wrist lock." According to the officers, Synek continued to struggle, scream profanities, and incite other partygoers as Officer McCarty led her out of the building. Then, once they arrived at the police cruiser, Officer McCarty contends that Synek refused to enter the vehicle, cursing, screaming, and stiffening her body. In order to place her into the vehicle, Officer McCarty claims he had to push on her hip to make her lose her balance and fall in. Synek, McCarty states, continued to struggle, kicking at him and the door of the cruiser once positioned partway inside.

In this case, given this significant factual dispute and the Court's inability to make fact calls on summary judgment, the Court cannot conclude that the officers are entitled to qualified immunity. It is not possible, without making factual determinations, to decide whether there was a constitutional violation for purposes of the qualified immunity analysis. *Bass v. Robinson*, 167 F.3d 1041, 1046 (6th Cir. 1999) (" 'it is impossible to determine, without choosing between the parties' sharply different factual accounts, whether the force the officers used, objectively assessed, was reasonable.' ") (quoting *Jackson v. Hoylman*, 933 F.2d 401, 403 (6th Cir. 1991)). The Sixth Circuit has found genuine issues of material fact to preclude summary judgment in similar instances where the suspect was arrested for a minor crime, posed little to no threat, and did not flee or otherwise resist arrest. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 254 (6th Cir. 2010) (suspect, though not hurt, was allegedly spun around, slammed against his vehicle, and had his feet kicked apart); *Solomon*, 389 F.3d at 167 (suspect being arrested for

21

trespassing in a movie theater was shoved into a display case and kicked in the legs); *Carpenter v. Bowling*, 276 Fed. App'x 423, 423 (6th Cir. 2008) (suspect being arrested for disorderly conduct was slammed into a van, jerked around by the arms, and an officer stuck his knee in her back).

Accordingly, because there are material factual disputes relevant to the issue of qualified immunity, the defendants' motion for summary judgment on this issue with respect to Synek's § 1983 claim is DENIED.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 13) is GRANTED IN PART and DENIED IN PART. The Court grants summary judgment in favor of defendant Brimfield Township with respect to plaintiff's failure to train and supervise claim and DISMISSES that claim. However, because there are material factual disputes regarding how the arrest of Kathleen Synek occurred, the Court cannot declare, as a matter of law, that the defendant officers are entitled to qualified immunity on her § 1983 claim. That claim must proceed.

**IT IS SO ORDERED**.

Dated: September 27, 2012

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**